**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0251** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **CLIFFORD BRADLEY, JR. and** | : | |
| **LATACHA RENEE THOMPSON,** | : | |

## MEMORANDUM

Presently before the court is a motion filed by defendants, Clifford Bradley, Jr. ("Bradley") and Latacha Renee Thompson ("Thompson"), to suppress evidence obtained during the search of a vehicle on two separate occasions. Thompson argues that the officer had no reasonable suspicion to justify the continued interrogation and detention during the first vehicle stop and that her consent to search was not voluntary.  Defendants also contend that there was no reasonable suspicion for the second vehicle stop and narcotics dog scan of the vehicle.  They also argue that the affidavit in support of the application for a search warrant lacked probable cause.  The government contends that Thompson's consent to the vehicle search during the first stop was valid.  The government also argues that the officers had reasonable suspicion for the second stop and narcotics dog scan and that there was probable cause for the search warrant.  For the reasons that follow, the court agrees with the government and will deny the motion to suppress.

## I.   Findings of Fact[1]

On June 20, 2007, defendants were indicted on charges of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, and the manufacture, distribution, and possession with intent to manufacture and distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).[2]  (Doc. 1.)  On June 27, 2007, defendants entered a plea of not guilty to the indictment.  (See Docs. 10, 12, 16.)  Defendants filed the instant motion to suppress the evidence obtained during two separate vehicle searches and their subsequent incriminating statements.  The court conducted an evidentiary hearing on the instant motion on January 22, 2008 (Doc. 51) and ordered supplemental briefing (Doc. 55).  The motion has been fully briefed and is ripe for disposition.

### A.   Vehicle Stop and Search on May 14, 2007

On the morning of May 14, 2007, Special Agent Keith T. Kierzkowski ("Agent Kierzkowski")[3] received a call from a confidential informant ("CI").  The CI related information regarding Thompson.  Specifically, the CI informed Agent Kierzkowski

---

[1] These findings are based on testimonial and documentary evidence presented at the hearing on the motion, as well as the police video provided by the parties.  See United States v. Pelullo, 173 F.3d 131, 135-38 (3d Cir. 1999); see also Ornelas v. United States, 517 U.S. 690, 695-98 (1996).  They substantially reflect the testimony given by the law enforcement officials, which the court credits.

[2] Thompson was not charged with the latter offense.

[3] Agent Kierzkowski has been with the Drug Enforcement Agency for approximately ten years, almost five of which have been in Harrisburg, Pennsylvania.  (Doc. 53 at 4-5.)

2

that Thompson was taking Duwanna Robinson ("Robinson") to Atlanta, Georgia with a large quantity of U.S. currency to purchase approximately one kilogram of crack cocaine.  The CI reported the vicinity of where Robinson lived and advised that Thompson would be picking up Robinson within the next hour in a rental vehicle.  (See Doc. 53 at 5-6.)  Agent Kierzkowski had used this CI previously.  He had spoken with the CI at least ten times prior to May 14, 2007 and corroborated the information received, which led to arrests and a large seizure of cocaine.  (Id. at 22-23.)

To corroborate the information received from the CI, Agent Kierzkowski, Agent Cook, and Detective Cornick set up surveillance in the vicinity of Robinson's residence.  Detective Cornick observed Thompson arrive in a maroon vehicle and enter a residence.  Agent Kierzkowski then witnessed Thompson and Robinson leave the residence, enter the vehicle, and depart the area.  (Id. at 6-7.)  The surveillance continued to a local diner where Thompson and Robinson stopped for a short time.  They exited the diner with Bradley and Tyquann Brown ("Brown"). (Id. at 8.)  Thompson and Robinson left in their rental vehicle; Bradley and Brown in another vehicle.  (Id. at 9.)  After following Thompson to another residence in the Hershey area and then onto Route 81 South, Agent Kierzkowski coordinated with the Pennsylvania State Police, specifically with Trooper Tony Todaro ("Trooper

Todaro"),[4] to conduct a stop of Thompson's vehicle.[5]  (Id. at 9-10.)  Agent

Kierzkowski informed Trooper Todaro about what he had learned from the CI

about a large amount of currency in Thompson's vehicle.  (Id. at 10-11.)  At no time

during his surveillance of Thompson and Robinson did Agent Kierzkowski witness

either of them receive currency or bags from anyone.  Nor did Agent Kierzkowski

witness the placement of any bags in the vehicle.  (Id. at 12-15.)

Trooper Todaro effected a traffic stop of Thompson's vehicle after his radar

device displayed her speed at 80 miles per hour in a 65-mile-per-hour zone.[6]  (Id. at

27.)  After Thompson pulled her vehicle over, Trooper Todaro approached the

vehicle on the passenger side, away from oncoming traffic, and requested that

Thompson present her driver's license and vehicle registration.  (Id. at 28.)

Thompson provided her driver's license and the rental agreement for the vehicle.

When asked what her rush was, Thompson explained that she needed to use the

---

[4] Trooper Todaro has been with the Pennsylvania State Police for almost
fifteen years.  For the last four years, he has been assigned to the Bureau of
Criminal Investigation, Drug Law Enforcement Division as a Narcotics Interdiction
Officer.  (Doc. 53 at 24-25.)

[5] Agent Kierzkowski noted that Thompson was traveling at a high rate of
speed because he was traveling at 85 to 90 miles per hour just trying to maintain
visual contact with Thompson's vehicle.  (Doc. 53 at 9-10.)

[6] Thompson admits that she was speeding at the time.  (See Doc. 53 at 140.)

restroom.[7]  (Id. at 29.)  Not able to hear Thompson over the traffic noise, Trooper

Todaro asked Thompson to exit the vehicle and go to the rear of her vehicle in front

of his patrol car.  (Id. at 31.)  Reviewing the rental agreement, Trooper Todaro

noticed that Thompson was not the renter of the vehicle, nor an authorized driver.

(Id. at 29-30.)  He questioned Thompson about her travel plans and learned that she

was traveling to Atlanta, Georgia.  (Id. at 30-31; Video[8] at 12:21:18-12:21:22.)

Trooper Todaro informed Thompson that the rental agreement only permitted in-

state travel.  (Doc. 53 at 32; Video at 12:21:22-12:21:30.)  Trooper Todaro asked

Thompson about the passenger in the vehicle and was told that it was Thompson's

cousin, Dawanna Crawford.  (Doc. 53 at 32.)  Trooper Todaro then questioned the

passenger, who told him her name was Dawanna Robinson.

Following this questioning, Trooper Todaro returned to his patrol car.  (Id. at

33.)  Thompson remained outside her vehicle and sat down on the guide rail.  (Id. at

34.)  Shortly thereafter, Trooper Todaro approached Thompson to give her a

warning notice.[9]  He explained the reason for the warning and advised her that it

---

[7] Trooper Todaro doubted that she needed to use the restroom because
Thompson had just passed an exit and also a restroom within the previous ten
miles.  (Doc. 53 at 29.)  When Trooper Todaro eventually returned to the station and
Thompson arrived there, he noticed that she was wet and Thompson informed him
that she urinated on herself.  (Id. at 80.)

[8] Citations to "Video" refer to the police video that the parties offered to
supplement the suppression hearing record.  (See Doc. 60.)

[9] The audio portion of the police video was turned off after Trooper Todaro
returned to his vehicle and was turned back on during his further questioning of
Thompson and Robinson.  (Video at 12:23:46-12:34:10.)

was not a citation.  (Id. at 34-35.)  He informed Thompson that he was giving her a break by not contacting the rental agency.  (Id. at 151.)  Trooper Todaro also returned Thompson's documentation to her.  After asking Thompson if she had any questions, Trooper Todaro informed Thompson that she was free to leave.  (Id. at 35.)  Trooper Todaro then asked Thompson if he could ask her a few more questions and she agreed to answer further questions.  (Id.)

Trooper Todaro asked Thompson some clarifying questions regarding her travel itinerary and passenger.  (Id. at 35-36.)  Her answers were consistent with her previous answers, except that she now identified the passenger with a different last name—Robinson.  (Id. at 36.)  Trooper Todaro then informed Robinson, who remained in the vehicle, that she was free to leave, but, after obtaining her permission, he asked Robinson some further questions.  (Video at 12:34:20-12:36:15.)  After questioning Robinson, Trooper Todaro returned to Thompson at the rear of the vehicle.  (Id. at 12:36:15-12:36:20.)  He asked her if there was anything illegal in the vehicle.  He specifically asked if there were any weapons, guns, knives, narcotics, marijuana, cocaine, heroin, or methamphetamines in the vehicle.  She responded "no."  (Doc. 53 at 36-37; Video at 12:36:20-12:36:35.)  Trooper Todaro then asked if she had large amounts of currency in the vehicle, to which she responded "what's that."  He repeated his question and Thompson again responded "what's that."  When Trooper Todaro used the term "money" instead of "currency" in the question, Thompson understood and responded "no."  (Doc. 53 at 37; Video at 12:36:35-12:36:45.)

After Thompson told him that there was nothing illegal in the car, Trooper Todaro asked for her permission to search the vehicle before she left. (Doc. 53 at 37; Video at 12:36:45-12:36:48.) When Thompson did not give a definitive answer, Trooper Todaro twice asked for a "yes or no" answer. (Doc. 53 at 38; Video at 12:36:48-12:37:00.) Thompson responded "no" and Trooper Todaro turned and took a step toward his patrol car and said "okay, okay, just a moment."[10] (Doc. 53 at 38; Video at 12:37:00-12:37:03.) Immediately thereafter, Thompson indicated that Trooper Todaro could conduct the search. (Doc. 53 at 38; Video at 12:37:04-12:37:07.) Trooper Todaro retrieved a written waiver of rights and consent to search form. He explained to Thompson that he was giving her a break by not calling the rental agency.[11] (Doc. 53 at 151; Video at 12:38:48-12:38:53.) When he asked her again if he could search the vehicle, Thompson asked what he meant by search the vehicle.[12] Trooper Todaro responded: "You got something to hide" and "search the vehicle means search." (Id. at 12:39:05-12:39:20.) He then explained the contents of the consent form and indicated that he was going to search the vehicle for weapons, knives, narcotics, money, and other similar items. Trooper Todaro

_____

[10] Trooper Todaro planned to summon the narcotics dog unit, but he did not inform Thompson of his intention. (Doc. 53 at 56-57.)

[11] Trooper Todaro also informed Thompson that the owner of the vehicle—the rental agency—would not consider her to have equal access to the vehicle because she was not listed on the rental agreement. (Video at 12:39:53-12:40:02.)

[12] During this time, another officer arrived on the scene. (Video at 12:39:00.)

7

told Thompson to read the entire form and acknowledge her agreement with it by

signing the form. (Doc. 53 at 39; Video at 12:39:21-12:40:31.) After reviewing the

form for a brief period, Thompson signed it.[13] (Doc. 53 at 39-40; Video at 12:40:34-

12:41:00.)

After having the passenger exit the vehicle, Trooper Todaro asked Thompson

if he could use a dog to search the vehicle rather than having the officers search

through her personal belongings. Thompson gave permission for the dog to search

the vehicle.[14] (Doc. 53 at 41; Video at 12:41:45-12:42:20.) The narcotics dog alerted

to the driver's side rear door. (Doc. 53 at 41; Video at 12:44:35-12:44:54.) Once

inside the vehicle, the dog again alerted to an odor, but could not pinpoint the

precise location.[15] (Doc. 53 at 41.) The dog's handler searched a black personal bag

on the rear seat behind the driver's seat and found a large quantity of U.S.

currency. (Video at 12:47:36-12:48:35.) After finding the currency, the dog handler

---

[13] The government did not produce the consent form at the suppression
hearing.

[14] Some time after the narcotics dog arrived, Thompson told Trooper Todaro
that she was calling her attorney. (Doc. 53 at 57.58.) She was unable to reach her
attorney by phone. (Id. at 143.)

[15] During the dog's scan of the vehicle, Thompson voiced her concern that the
officers were attempting to make the dog find something. She reiterated that she
did not have any drugs in the car. (Video at 12:45:25-12:46:45.) Thompson
attempted to move closer to the vehicle and dog handler to hear and see what was
occurring during the search, but Trooper Todaro directed Thompson to remain at
the guide rail away from her vehicle, the patrol car, and on-coming traffic for her
safety. He informed Thompson that he would handcuff and arrest her if she
continued to approach the vehicle. (Id. at 12:47:10-12:48:25; Doc. 53 at 42, 83.)

8

removed the bag from the vehicle and placed it on the trunk.  Thompson then informed the officers that they were not allowed to go through her vehicle or bags. (Id. at 12:48:35-12:48:45.)  They removed the contents of the bag onto the trunk and asked Thompson about the currency, which was in a separate plastic bag.[16]  (Id. at 12:48:45-12:49:25; Doc. 3 at 42-44.)

Trooper Todaro informed Thompson that he suspected that the currency was proceeds from narcotics sales and that he would seize the currency and subject it to a cash scan by a narcotics dog back at the station.  (Id. at 45.)  He advised Thompson that she could, but was not required to, return to the station with the officers to get a receipt for the currency.  After initially responding that she needed to leave, Thompson decided otherwise and followed the officers to the station in her rental vehicle.  (Id. at 46-47.)

**B.      Vehicle Stop and Search on June 15, 2007**

On June 13, 2007, Agent Kierzkowski spoke on the phone with the same CI as on the previous occasion.  (Doc. 53 at 84-85, 92.)  The CI informed Agent Kierzkowski that Thompson and Bradley had rented a vehicle at Harrisburg International Airport ("HIA"), traveled to the Philadelphia airport, parked the vehicle, traveled to Atlanta, Georgia by plane to pick up a large amount of crack

---

[16] In the plastic bag were twenty-five individual bundles of currency totaling $25,000.  (Doc. 53 at 42, 44, 47.)

cocaine, and were planning to return in a few days by Amtrak train.[17]   (<u>Id.</u> at 85.)

---

[17] In their supplemental brief in support of the instant motion, defendants challenged, for the first time, the existence of the CI.  (<u>See</u> Doc. 58 at 21.)  As previously addressed by the court (<u>see</u> Doc. 63 at 1 n.1), the court would be remiss if it did not express its concern over the obscure manner in which defendants raised this serious charge, to wit: in the last sentence of a paragraph on page 21 of the brief.  Without offering any evidence during the suppression hearing on this issue, despite prior knowledge of the information obtained from the CI (<u>see</u> Doc. 50 at 2), defendants now contend that they did not tell anyone of their plans to travel back from Atlanta by train and that it was a last minute decision they made on the day of travel (<u>see</u> Doc. 58 at 21).  By not presenting this evidence during the suppression hearing, the government did not have the opportunity to explore the issue on cross examination.  Defendants' argument is, in essence, an attack on Agent Kierzkowski's credibility.

Defendants did not provide any Third Circuit caselaw addressing this issue (<u>see</u> <u>id.</u> (discussing a <u>Darden</u> hearing under New York state law)), and the court finds none directly on point.  In an abundance of caution, the court directed the government to submit to the court *in camera* one of the following sources of information about the CI:  (1) sworn affidavit from the CI, (2) reports about the CI, (3) Agent Kierzkowski or another agent, or (4) the CI.  <u>Cf.</u> <u>United States v. Balduino-Solano</u>, No. 06-3063, 2008 WL 650298 (3d Cir. Mar. 12, 2008) (identifying various sources of information that a court may review before ruling on a defendant's request to require disclosure of an informant's identity (citing <u>United States v. Jiles</u>, 658 F.2d 194 (3d Cir. 1981) and <u>United States v. Jackson</u>, 384 F.2d 825 (3d Cir. 1967))).  The government chose to present Agent Kierzkowski for an *ex parte* examination before the court.  Defendants did not object to this choice (<u>see</u> Docs. 63, 65 (permitting defendants to file objections)) and submitted a proposed list of questions for the *ex parte* examination (<u>see</u> Doc. 67).

The court conducted the *ex parte* examination of Agent Kierzkowski on April 1, 2008 and directed that the transcript (Doc. 69) and accompanying exhibits be filed under seal.  (<u>See</u> Doc. 68.)  During the *ex parte* examination, Agent Kierzkowski described his ongoing interaction with the CI.  The court finds that Agent Kierzkowski was truthful and accurate when describing the CI and that the CI exists and is an identifiable individual, not an anonymous source, who has provided accurate information regarding criminal activity to Agent Kierzkowski before, during, and after the events at issue in the instant matter.  The investigative reports and surveillance photographs appended to the transcript as exhibits lend further support for the court's finding that Agent Kierzkowski gave credible and accurate testimony regarding the CI.  Therefore, defendants' challenge to the existence of the CI is without merit.

Agent Kierzkowski corroborated this information.  An agent in Philadelphia verified that Thompson and Bradley had taken a flight to Atlanta, Georgia.  Agent Kierzkowski and another agent identified the rental agency at HIA that rented the vehicle to Thompson and Bradley and learned the vehicle's identifying information.  With this information, they traveled to Philadelphia and located the vehicle in the airport parking area.  On June 14, 2007, Agent Kierzkowski also learned that Thompson and Bradley were returning to Philadelphia by Amtrak train the next day at approximately noon.[18]  (Id. at 86-87.)

Agent Kierzkowski coordinated a surveillance operation of the rental vehicle on June 15, 2007.  He observed Thompson and Bradley return to the rental vehicle with Bradley placing bags in the trunk.  (Id. at 88.)  After Thompson and Bradley left the airport in their rental vehicle, they accessed the Pennsylvania Turnpike.  Agent Kierzkowski followed the vehicle to a rest stop and maintained surveillance while Thompson and Bradley went to a restaurant.  (Id. at 89.)  When Thompson and Bradley reentered the Turnpike towards Harrisburg, Agent Kierzkowski contacted Trooper Brian Overcash ("Trooper Overcash") of the Pennsylvania State

---

[18] Agent Kierzkowski became concerned that defendants might be traveling on different trains, so the agents started surveillance at the Philadelphia airport early in the morning on June 15, 2007 to ensure that they did not miss either defendant returning to the rental vehicle at the airport.  (Doc. 53 at 95.)

Police.[19]  Agent Kierzkowski provided Trooper Overcash with the information he

knew about Thompson and Bradley.  (Id.)

Trooper Overcash was in the passenger seat of a patrol car driven by Trooper

Todaro.  (Id. at 100.)  They waited for Thompson and Bradley's vehicle on the

Turnpike and eventually determined the speed of the vehicle to be 75 miles per

hour in a 65-mile-per-hour zone.[20]  (Id. at 101.)  After pulling the vehicle over,[21]

Trooper Overcash approached the passenger side of the vehicle and requested

identification and registration information.  (Id. at 102.)  Trooper Overcash asked

Thompson, the driver, to exit the vehicle.  He issued a warning notice to her and

informed her she was free to leave.  (Id. at 102-03.)  He then asked if she would

answer a few questions.  Trooper Todaro approached at this time and Thompson,

apparently recognizing Trooper Todaro from the prior traffic stop, became very

talkative and argumentative.  (Id. at 103.)  Trooper Overcash requested but was

denied consent to search the vehicle.  (Id.)  Trooper Overcash informed Thompson

and Bradley that he was going to have a narcotics dog scan their vehicle.  (Id. at

---

[19] Trooper Overcash has been with the Pennsylvania State Police since 1994 and with his current assignment—the Bureau of Criminal Investigation, Drug Enforcement Division—for approximately four years.  (Doc. 53 at 99-100.)

[20] Bradley testified that Thompson was not speeding because the car was on cruise control.  (See Doc. 53 at 148.)  However, the lawfulness of this stop and subsequent search does not depend on whether Thompson was speeding.  See infra Part II.B.

[21] Agent Kierzkowski positioned his vehicle approximately one-half mile behind the traffic stop and he was not involved in the traffic stop.  (Doc. 53 at 90-91.)

105.)  He then called Detective Keith Ocker ("Detective Ocker") to the scene to

conduct an exterior scan of the vehicle with the narcotics dog.[22]  (Id. at 104-05.)

At the outset of the traffic stop, Detective Ocker had positioned his car within

a half mile of the traffic stop.  After being called by Trooper Overcash, Detective

Ocker waited two minutes and then proceeded to the location of the traffic stop.  He

arrived with his narcotics dog, Centa.  (Id. at 120, 122-24.)  Detective Ocker and

Centa had completed K-9 school, which is a four-week, 250-hour certification

program in obedience, aggression control, article searches, tracking, and drug

searches.  (Id. at 120.)  Through the training process, Centa was one hundred

percent accurate on drug detection.[23]  (Id. at 130.)  Prior to the stop at issue,

Detective Ocker and Centa had conducted approximately forty-five narcotics scans

---

[22] Detective Ocker is employed by the Derry Township Police Department.
He has been assigned to the Dauphin County Drug Task Force for approximately
five years.  Detective Ocker has twelve years experience as a narcotics dog handler.
(Doc. 53 at 119.)

[23] Detective Ocker recalled only two occasions prior to the stop at issue when
Centa alerted to an odor of narcotics but none were found on a subsequent search.
Such occasions do not demonstrate the inaccuracy of Centa.  As Detective Ocker
explained, Centa would alert to a "dead scent" (i.e., the residual odor from narcotics
that had been removed from an area).  (Doc. 53 at 127-30.)

and seized approximately $440,000.00 in narcotics and U.S. currency.[24]  (Id. at 121,

126, 133-34; Doc. 45, Ex. 2.)

Once on the scene of the traffic stop, Detective Ocker noted the direction of

the wind and began the exterior scan of Thompson and Bradley's vehicle with

Centa.  (Doc. 53 at 123.)  Centa alerted to the left rear of the vehicle, including the

bumper and trunk area.[25]  (Id.)  Trooper Overcash explained to Thompson and

Bradley that because the dog alerted to the presence of narcotics, he would be

applying for a search warrant.  He secured them with handcuffs and placed them in

his patrol car.

Detective Todd A. Johnson ("Detective Johnson") prepared the affidavit of

probable cause for the search warrant.  Trooper Overcash informed Detective

Johnson of the speed of Thompson and Bradley's vehicle.  (Id. at 107-08.)  Detective

Ocker provided Detective Johnson with the information about himself and Centa

contained in the affidavit of probable cause.  (Id. at 126, 133-34.)  The affidavit reads,

in pertinent part, as follows:

_____

[24] During the suppression hearing, Detective Ocker could not recall precisely
how many narcotics scans he and Centa had performed prior to this stop.  He
guessed twenty to twenty-five times.  (Doc. 53 at 121.)  However, Detective Ocker
testified that he provided the information contained in the affidavit of probable
cause for the search warrant and that the information was accurate.  (Id. at 126,
133-34.)  The affidavit indicates that Detective Ocker and Centa had conducted
approximately forty-five narcotics scans prior to this stop.  (Doc. 45, Ex. 2.)

[25] Centa is an aggressive alert dog, so he scratches and bites at an area where
he detects narcotics.  (Doc. 53 at 123.)

On 6-15-07 around 1525 hours the Pennsylvania State Police stopped a vehicle on the Pennsylvania Turnpike. PSP requested assistance from DCDTF [Dauphin County Drug Task Force]. Detective Keith Ocker and his K-9 Centa responded to the location of the stop.

Detective Ocker has been a K-9 handler from 1994 until 2004, with his K-9 Ajax. As a K-9 team Ajax and Detective Ocker seized approximately 8 million in narcotics and U.S. Currency. Detective Ocker is currently with his K-9 Centa. Detective Ocker and Centa have completed 250 hours of K-9 training. This training included the certification as a K-9 narcotics team through the North American Police Work Dog Association. To date Detective Ocker and Centa have conducted approximately 45 controlled substance searches and have seized around $440,000.00 in narcotics and U.S. Currency.

Detective Ocker and his K-9 Centa conducted a drug scan on the above listed vehicle. K-9 Centa indicated a positive response for the presence of a controlled substance within the vehicle.

(Doc. 45, Ex. 2.) Based on Detective Johnson's affidavit of probable cause, the magistrate judge issued a search warrant authorizing a search of Thompson and Bradley's vehicle for controlled substances. (See Doc. 45, Ex. 2.) The subsequent search yielded approximately eight ounces of crack cocaine.[26] (Doc. 53 at 91.)

## II.   **Discussion**

Thompson argues that the search following the May 14, 2007 vehicle stop was invalid because Trooper Todaro did not have reasonable suspicion to justify continuing the stop after giving her the warning notice and she did not voluntarily consent to the search. Thompson and Bradley contend that the search following the second stop on June 15, 2007 was invalid because the officers did not have

---

[26] Thompson and Bradley were then arrested and interrogated. They provided the officers with incriminating statements. (Doc. 45 ¶ 15-16.)

reasonable suspicion for the stop and subsequent scan by the narcotics dog and the affidavit in support of the search warrant did not establish probable cause for the search.  They also argue that their subsequent incriminating statements must be suppressed as fruit of the poisonous tree of the illegal seizure and search on June 15, 2007.  The court will address these stops and subsequent searches *seriatim*.

### A.   <u>Vehicle Stop and Search on May 14, 2007</u>

With limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 573 (2002).  A warrantless search is presumptively unreasonable, and the burden is on the government to establish, by a preponderance of the evidence, that the circumstances justified acting without a warrant.  <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984); <u>United States v. Matlock</u>, 415 U.S. 164, 177 (1974); <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1970).

Although strictly a legal issue, the constitutional reasonableness of a search is fact-specific, dependent on the individual circumstances surrounding the officers' conduct.  <u>See</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 695-98 (1996) (citing <u>Ker v. California</u>, 374 U.S. 23, 33 (1963)).  It is not usually susceptible to answer-by-analogy but must be evaluated through application of the particular facts of the case to general guiding principles.  <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 231-32 (1983); <u>see also</u> <u>Christopher v. Nestlerode</u>, 373 F. Supp. 2d 503, 514-15 (M.D. Pa. 2005); <u>United</u>

States v. Wogan, 356 F. Supp. 2d 462, 466 (M.D. Pa. 2005).  Every search is, in essence, *sui generis*.

One recognized exception to the warrant requirement permits police officers to conduct a search if they obtain consent from the individual in control of the area to be searched.  See United States v. Drayton, 536 U.S. 194, 200-01 (2002).  Consent, to be effective, must be given voluntarily and during the course of a legal encounter.  Id.  The legality of an encounter often turns on whether the individual has been "seized" by police, implicating Fourth Amendment protections.  Id.  If no seizure has occurred, the sole question becomes whether the consent was voluntary.  Id.; United States v. Wilson, 413 F.3d 382, 388 (3d Cir. 2005); United States v. Griggs, 114 F. Supp. 2d 334, 338 (M.D. Pa. 2000).

Whether a police encounter rises to the level of a seizure, requiring police to have at least "reasonable suspicion" of illegal activity, hinges on whether a reasonable person, exposed to the same surrounding circumstances, would feel free to terminate the encounter.  Drayton, 536 U.S. at 202.  "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation through coercive means."  Id.  Coercion, sufficient to transform an encounter into a seizure, generally requires that police act in a threatening or dominating manner, by brandishing a firearm or making a "show of force."  Id.  That an officer wears a uniform and a holstered sidearm does not,

without more, create intimidation sufficient to overcome the resolve of a "reasonable person." Id.

In the matter *sub judice*, it is undisputed that the initial traffic stop constituted a seizure. See Wilson, 413 F.3d at 386 n.3. Thompson admitted that she was speeding (see Doc. 53 at 140) and concedes that this initial seizure was lawful under the Fourth Amendment for a violation of state traffic laws (see Doc. 58 at 2). Thompson contends, however, that the officer's further questioning after issuing the warning notice and returning all documentation constituted a second seizure that was not supported by reasonable suspicion. A traffic stop may become a consensual encounter, not considered a seizure under the Fourth Amendment, after the return of documentation. See Wilson, 413 F.3d at 386-87. The relevant inquiry again is whether, under the totality of the circumstances, a reasonable person would feel free to terminate the encounter. See id. at 387.

The court recognizes that Thompson was questioned *after* she had already been seized once. However, the initial traffic stop is only one factor that the court must consider in its evaluation of the totality of the circumstances. The record in this case is devoid of any evidence suggestive of coercion or intimidation sufficient to transform the "second" encounter into a seizure. The traffic stop occurred during daylight hours on the side of the interstate with standard highway conditions. After Thompson received the warning and her documentation and the traffic stop was ostensibly concluded, Trooper Todaro informed Thompson that she was "free to leave." He did nothing thereafter to detain Thompson or prevent her

18

from leaving.  Indeed, Thompson testified that she believed that she was free to leave after she received the warning.[27]  Trooper Todaro then asked Thompson if she would answer a few more questions.  Whatever coercive effect this questioning produced on Thompson may be attributed to consciousness of guilt rather than extraneous pressure.  See Drayton, 536 U.S. at 202. ("The reasonable person test . . . presupposes an *innocent* person.").  A reasonable, innocent person would not have felt intimidated or pressured by the trooper's questions, predicated as they were by the advice that Thompson was "free to leave."  Trooper Todaro was the only officer present when he requested Thompson's permission to ask additional questions.  He was also the only officer present when Thompson gave her verbal consent to search.  Based upon these facts, the court finds that the interaction between Trooper Todaro and Thompson did not rise to the level of a "seizure," but constituted a mere encounter in which Thompson could effectively consent to a search of the vehicle.

---

[27] On direct examination during the suppression hearing, Thompson testified as follows:

> Q:     Let me take you back to the warning.  You testified that you
>        received the warning?
> A:     Yes.
> Q:     After he gave you the warning did you feel free to leave?
> A:     Yes.
> Q:     You felt free to leave and go home after he gave you the
>        warning?
> A:     Yes.

(Doc. 53 at 144.)

Nothing in the record suggests that Thompson's consent was involuntary. Determining whether consent was voluntary is a question of fact requiring the court to examine the totality of the circumstances. <u>Wilson</u>, 413 F.3d at 388.  "[T]he critical factors comprising a totality of the circumstances inquiry include the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]."  <u>Id.</u> (quoting <u>United States v. Givan</u>, 320 F.3d 452, 459 (3d Cir. 2003)).  In the matter *sub judice*, Trooper Todaro did not use force or intimidation when asking Thompson if she would consent to a search of the vehicle.  He did not raise his voice or threaten Thompson.  Thompson was even aware that she could refuse consent to search because Trooper Todaro indicated that he needed a "yes or no" answer to his request for consent to search.  Moreover, immediately after her oral consent, Thompson signed the written consent form.  There is no indication that Thompson was unable by virtue of her age, intelligence, or educational background to understand the situation.  Coupled with the lack of intimidation or show of force by Trooper Todaro or the other officer who arrived as Thompson's was giving her written consent, these circumstances demonstrate that Thompson's consent was

voluntary.[28]   At no time before the dog handler found money in her bag did

Thompson revoke her consent.[29]   Therefore, the stop and search conducted on

---

[28] Thompson argues that her consent was limited in scope and did not encompass consent to search bags located inside the vehicle.  This argument is unpersuasive.  An objective reasonableness standard governs the scope of consent. See United States v. Kim, 27 F.3d 947, 956 (3d Cir. 1994) ("The standard . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991))); see also Reppert v. Marino, No. 06-4239, 2007 WL 4547737, at *10 (3d Cir. Dec. 27, 2007).  In the instant matter, Thompson did not limit the scope of the search when she gave consent.  In addition, Trooper Todaro explicitly informed Thompson that he would be searching the vehicle for weapons, knives, narcotics, money, and other similar items after he had inquired whether she had any of these items in the vehicle.  Therefore, a reasonable person would have understood Thompson's general consent as authorizing a search of any bags within the vehicle which could have contained these items, including the black bag found on the rear seat behind the driver's seat.  See, e.g., United States v. Perez, 246 F. App'x 140, 146 (3d Cir. 2007) (concluding that the defendant authorized the search of a bag in the trunk when, inter alia, the bag "was capable of holding several if not all of the items for which [the defendant] knew the officers were searching"); United States v. Birt, 120 F. App'x 424, 428 (3d Cir. 2005) ("[The defendant] was asked if he had illegal drugs, and a reasonable person would thus have understood his general consent to the search as authorizing the search of any containers in which narcotics might be found . . . .").  Although Thompson expressed concerns during the search that the officers were attempting to make the narcotics dog find something, she did not tell the officers to stop searching or revoke her consent.  It was only after the dog handler found money in her bag that Thompson informed the officers that she did not consent to a search of her bags.

[29] See supra note 28.

21

May 14, 2007 was lawful.[30]  Accordingly, the court will deny the motion to suppress

with respect to this stop and search.

### B.    Vehicle Stop and Search on June 15, 2007

The Fourth Amendment's prohibition against "unreasonable searches and

seizures" does not prohibit law enforcement officials from conducting a brief

investigatory stop (i.e., a Terry[31] stop) of a subject if they have "reasonable

suspicion," based on the totality of the circumstances, that the individual is engaged

or has engaged in illegal activity.  See United States v. Arvizu, 534 U.S. 266, 273

(2002) (citing Terry v. Ohio, 392 U.S. 1 (1968)).  Determining whether reasonable

suspicion exists requires an objective analysis, considering the totality of the

circumstances.  See United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006).  An

informant's tip may provide the necessary reasonable suspicion to justify an

investigatory stop.  See Alabama v. White, 496 U.S. 325, 330 (1990).  When

reasonable suspicion is based on information provided by an informant, the court

---

[30] Thompson also argues that Trooper Todaro's further questioning after
giving her the warning notice violated her Miranda rights, see Miranda v. Arizona,
384 U.S. 436 (1966), thereby rendering any consent invalid.  The court is
unpersuaded.  The evidence of record reveals that Thompson was *not* in custody
during this further questioning.  See United States v. Willaman, 437 F.3d 354, 359
(3d Cir. 2006) ("Miranda, of course, requires warnings only when the person the
police are questioning is in custody.").  The questioning occurred during a
consensual encounter.  Thompson was free to leave and voluntarily agreed to
answer further questions.  At no time did Trooper Todaro or the other officer
intimidate, coerce, or threaten Thompson.  See id. at 359-60 (discussing factors to
consider in determining whether a person is in custody).  Therefore, Thompson was
not in custody and not entitled to receive Miranda warnings.

[31] Terry v. Ohio, 392 U.S. 1 (1968).

must consider "both the reliability of the tip or informant and the content of the tip." Goodrich, 450 F.3d at 559-60.

In the matter *sub judice*, the court finds that the officers had reasonable suspicion to conduct an investigatory stop of Thompson and Bradley's vehicle, including the exterior vehicle scan by the narcotics dog, based on the CI's information and independent corroboration. The CI informed Agent Kierzkowski that Thompson and Bradley were traveling to Atlanta, Georgia to pick up a large amount of crack cocaine. The CI gave details about Thompson and Bradley's trip to Atlanta; to wit: (1) they rented a vehicle at HIA, (2) they traveled to the Philadelphia airport where they parked their rental vehicle, and (3) they traveled to Atlanta, Georgia by plane. The CI also predicted Thompson and Bradley's future plan to return via Amtrak train. See, e.g., White, 496 U.S. at 332 ("[T]he anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. . . . What was important was the caller's ability to predict [the defendant's] *future behavior*, because it demonstrated inside information–a special familiarity with [the defendant's] affairs."); United States v. Andrews, 38 F. App'x 824, 826 (3d Cir. 2002); see also United States v. Cook, No. Crim.A.04-414, 2005 WL 1484592, at *9 (E.D. Pa. June 22, 2005). Agent Kierzkowski was able to corroborate all of the information provided by the CI. In addition, the CI had provided reliable information in the past. Before both incidents involving Thompson, Agent Kierzkowski had spoken with the CI at least ten times and

23

corroborated the information received, which led to arrests and a large seizure of cocaine.[32]   Therefore, the court finds that the officers had reasonable suspicion based on the CI's information and subsequent independent corroboration to conduct an investigatory stop of Thompson and Bradley's vehicle.[33]

The use of a narcotics dog does not transform this investigatory stop into an unlawful one.  See Illinois v. Caballes, 543 U.S. 405 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."); see also United States v. Hutchinson, 471 F. Supp. 2d 497, 504-05 (M.D. Pa. 2007).  In the instant matter, the officers reasonably suspected that Thompson and Bradley's vehicle contained narcotics.  After unsuccessfully attempting to get consent to search, the officers requested an exterior scan of the

---

[32] The CI also proved reliable when providing information regarding Thompson and a large amount of currency on May 14, 2007.  Even absent this incident, the court finds that the CI's previous dealings with Agent Kierzkowski demonstrate sufficient reliability for the court's reasonable suspicion analysis for the June 15, 2007 investigatory stop.

[33] Agent Kierzkowski provided Trooper Overcash with the information he knew about Thompson and Bradley and informed him that they were suspected of transporting narcotics.  (See Doc. 53 at 89.)  Therefore, Trooper Overcash possessed the necessary reasonable suspicion for the investigatory stop.  See, e.g., United States v. Thomas, 74 F. App'x 189, 191 (3d Cir. 2003) ("An officer is allowed to consider personal observations and the collective knowledge of several law enforcement personnel in determining whether reasonable suspicion exists."); see also Whiteley v. Warden, 401 U.S. 560 (1971) (explaining the collective knowledge doctrine in a probable cause context); United States v. Hensley, 469 U.S. 221 (1985) (expanding the collective knowledge doctrine into the reasonable suspicion context).

vehicle by a well-trained narcotics dog.  Within a few minutes, the narcotics dog

unit was on the scene of the vehicle stop.[34]  See, e.g., United States v. Leal, 235 F.

App'x 937, 941 (3d Cir. 2007) (considering "whether the police diligently pursued a

means of investigation that was likely to confirm or dispel their suspicions quickly,

during which time it was necessary to detain the defendant" in evaluating the

duration of an investigatory stop).  Therefore, the court finds that the officers did

not unreasonably extend the duration or scope of the investigatory stop.

Accordingly, the external scan of the vehicle by the narcotics dog did not violate the

Fourth Amendment.

　　　　Thompson and Bradley next argue that the search warrant obtained after the

narcotics dog alerted to the presence of a controlled substance lacked probable

cause for the search.  See U.S. Const. amend. IV (requiring "probable cause" to

believe that evidence of a crime will be found in the areas to be searched for a

search warrant to issue).  This argument is meritless.  "A positive alert to the

presence of narcotics by a well-trained drug-detecting canine provides probable

cause to justify a search."  Hutchinson, 471 F. Supp. 2d at 510-11 (citing Karnes v.

Skrutski, 62 F.3d 485, 498 (3d Cir. 1995), United States v. Massac, 867 F.2d 174, 176

---

[34] Bradley testified that only twenty to twenty-five minutes elapsed from the
time of the initial stop to the time the narcotics dog arrived.  (See Doc. 53 at 149.)
Only a few minutes elapsed, however, from the time the officers called for the dog to
the time the dog arrived.  See United States v. Leal, 235 F. App'x 937, 941-42 (3d Cir.
2007) (holding that an eighty-minute delay in waiting for the narcotics dog was
acceptable under Terry given the nature of the investigatory actions by the officers
and the reason for the delay).

(3d Cir. 1989), and <u>Florida v. Royer</u>, 460 U.S. 491, 506 (1983)).  In the instant matter, the court finds that the narcotics dog and his handler, Detective Ocker, were well trained.  They had successfully completed a 250-hour certification program at which the dog was one hundred percent accurate on drug detection.  In addition, Detective Ocker and this dog had conducted approximately forty-five narcotics scans and seized approximately $440,000.00 in narcotics and U.S. currency prior to the scan of Thompson and Bradley's vehicle on June 15, 2007.  Given the narcotics dog's training and positive alert on Thompson and Bradley's vehicle, the officers had probable cause to justify the search of the vehicle.[35]  <u>See id.</u>

Thompson and Bradley also contend that the affidavit of probable cause in support of the application for a search warrant did not contain adequate information regarding the dog's accuracy and reliability for the magistrate judge to determine whether probable cause existed.  The court disagrees.  Determining whether probable cause to search exists requires a totality of the circumstances analysis.  <u>United States v. Yusuf</u>, 461 F.3d 374, 390 (3d Cir. 2006); <u>see also</u> <u>United States v. Gaskins</u>, No. 06-1152, 2007 WL 3120329, at *1 (3d Cir. Oct. 25, 2007).

---

[35] The court notes that the automobile exception to the warrant requirement of the Fourth Amendment would have allowed the officers to search Thompson and Bradley's vehicle without a warrant because the officers "had probable cause to believe the vehicle contained drugs on the basis of [the narcotics dog's] alert." <u>Hutchinson</u>, 471 F. Supp. 2d at 511 (citing <u>United States v. Burton</u>, 288 F.3d 91, 100-01 (3d Cir. 2002)); <u>see also</u> <u>Karnes v. Skrutski</u>, 62 F.3d 485, 498 (3d Cir. 1995) ("[T]he automobile exception to the warrant requirement allows warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." (quoting <u>United States v. McGlory</u>, 968 F.2d 309, 343 (3d Cir. 1992))).

"Under this flexible standard, 'the task . . . is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Yusuf, 461 F.3d at 390 (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)).

In the instant matter, the affidavit of probable cause contained the aforementioned training, certification, and scans/seizures information regarding Detective Ocker and his narcotics dog.[36]  (See Doc. 45, Ex. 2.)  The court finds that this information was sufficient for the magistrate judge to determine the accuracy and reliability of the narcotics dog and handler.  The affidavit also contained the following information:  "[The narcotics dog] indicated a positive response for the presence of a controlled substance within the vehicle."  (Id.)  This "positive response" information combined with the information regarding the accuracy and reliability of the dog and handler demonstrated a strong likelihood that narcotics

---

[36] Although the affidavit does not refer to the dog's one hundred percent accuracy rate during training, it does indicate that Detective Ocker and his dog were certified as a K-9 narcotics team through the North American Police Work Dog Association.  Such certification clearly reflects a high accuracy rate.

27

would be found in the vehicle.[37]  Therefore, the affidavit provided the necessary

probable cause to issue the search warrant.  Accordingly, the court will deny

defendants' motion with respect to the stop and search on June 15, 2007.[38]

## III.    Conclusion

Neither the initial stop of Thompson's vehicle on May 14, 2007 nor the

subsequent questioning and consent search violated Thompson's Fourth

Amendment rights.  Likewise, the vehicle stop on June 15, 2007 and narcotics dog

scan of the vehicle was based on reasonable suspicion of criminal activity.  After the

well-trained narcotics dog alerted to the presence of a controlled substance within

the vehicle, probable cause existed to search the vehicle.  The affidavit in support of

the search warrant provided the magistrate judge with information sufficient to

establish probable cause for the search.  Therefore, the June 15, 2007 stop and

---

[37] Thompson and Bradley contend, without citing any legal support, that the affidavit was deficient because it did not indicate how or where the dog alerted to the presence of narcotics.  The court disagrees.  The manner in which the dog alerted to the presence of narcotics is immaterial to the probable cause determination.  Likewise, the precise location of the alert does not affect whether probable cause existed to search the entire vehicle for narcotics.  Therefore, the lack of information regarding how or where the dog alerted does not emasculate the probable cause analysis.

[38] Thompson and Bradley also seek the suppression of incriminating statements made after this stop and search as fruits of the poisonous tree.  They do *not* contend that their Miranda rights were violated.  Given the court's ruling that the June 15, 2007 stop and search were not unlawful, the court will deny this request without further discussion.

subsequent search did not violate defendants' Fourth Amendment rights.

Accordingly, the court will deny defendants' motion to suppress.

An appropriate order will issue.


_S/ Christopher C. Conner_
CHRISTOPHER C. CONNER
United States District Judge


Dated:        April 9, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 1:07-CR-0251** |
| | **:** | |
| **v.** | **:** | **(Judge Conner)** |
| | **:** | |
| **CLIFFORD BRADLEY, JR.** and | **:** | |
| **LATACHA RENEE THOMPSON,** | **:** | |

## <u>ORDER</u>

AND NOW, this 9th day of April, 2008, upon consideration of defendants'

motion to suppress evidence (Doc. 45), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that the motion (Doc. 45) is

DENIED.

      <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge